# Illinois Official Reports

## Appellate Court

---

### *People v. Gunn*, 2021 IL App (4th) 200398

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENDALL OMAR GUNN, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-20-0398 |
| Filed | October 21, 2021 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 08-CF-1381; the Hon. Charles M. Feeney III, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Jeffrey Bruce Kirkham, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Justices Harris and Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Kendall Omar Gunn, appeals from the trial court's judgment denying his amended postconviction petition following an evidentiary hearing, arguing, contrary to the finding of the trial court, he made a substantial showing that his constitutional right to the effective assistance of counsel was violated where his trial counsel, after waiving his right to have the trial court inquire about the prospective jurors' understanding and acceptance that a defendant's failure to testify cannot be held against him and promising the jury in opening statement that it would hear from him, changed course midtrial and advised him not to testify even though there was no unforeseeable event that occurred at trial to justify the change in strategy. We affirm.

¶ 2                              I. BACKGROUND
¶ 3                               A. Indictment
¶ 4    In December 2008, the State charged defendant by indictment with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2008)) for causing the death of Shane Howard. Thereafter, Amy Davis, the then McLean County public defender, was appointed to represent defendant. Davis served as defendant's lead counsel throughout the trial proceedings. Jennifer Locke, an assistant public defender, assisted Davis.

¶ 5                           B. Motion to Suppress
¶ 6    In May 2009, Davis filed a motion to suppress a statement the 18-year-old defendant made to detectives after his arrest, alleging his mental deficiencies prevented him from making a legally sufficient decision to waive his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Following a hearing, the trial court denied defendant's motion. In doing so, the court acknowledged defendant had a below-average intelligence.

¶ 7                               C. Jury Trial
¶ 8    In January 2010, the trial court conducted defendant's jury trial. Davis, after stating on the record her belief that defendant was going to testify, waived defendant's right to have the court ask prospective jurors if they understood and accepted the principle that a defendant's failure to testify cannot be held against him (see Ill. S. Ct. R. 431(b) (eff. May 1, 2007)).

¶ 9    In opening statement, Davis informed the jury it would hear defendant testify at trial. First, Davis said:

> "You are going to hear about a lot of lies in this case. Some of them have been told by my client. He's going to tell you that he lied about a number of things when he was talking to the police, and he's going to give you a reason why he lied. But the fact of the matter is, other people are going to tell you things that aren't true too, and it isn't up to [the State] or [the defense] to say that one's lying and that one isn't. That's your decision, just like it's your decision to come to a conclusion at the end as to what actually happened."

At another point, Davis stated:

> "You're going to hear a lot about my client from various people. You're going to hear speculation that he was a member of several gangs. Some people thought he was

- 2 -

a member of the Gangster Disciples. Some people thought he was something called a moe, which is someone associated with another group called the P-stones. Other people are going to tell you he wasn't in a gang. As a matter of fact, he's going to tell you he wasn't in a gang. *** But you're going to know by the end of the case here that he was friends with some people who were in gangs."

Finally, Davis told the jury:

"Now, the question about how many times he stabbed him I'm going to leave to the evidence in this case. It's not appropriate for me to talk to you about what I believe at this point in time. But I want you to listen carefully to that, because my client—from my client's perspective and the testimony that you will hear from him, is that he was trying to get Mr. Howard to back off. And he said, [']Stop. Get back.['] And when you listen to the medical examiner about the nature of the wounds, I believe that's consistent with what my client said. Two of the wounds were not lethal wounds, one was. Mr. Howard kept coming towards my client. My client finely [*sic*] stabbed him."

¶ 10 The State presented evidence showing, on December 11, 2008, Howard brought a knife, strapped to his arm, to a residential party where alcohol and marijuana were consumed. A physical altercation transpired between several individuals at the party, including defendant and Howard. At some point, Howard lost, and defendant gained, possession of the knife. Defendant stabbed Howard with the knife, which caused Howard's death. In presenting its case, the State elicited testimony from several witnesses who were at the party. Through that testimony, the jury was provided with information suggesting Howard (1) was intoxicated and angry; (2) had been confrontational with defendant and others; (3) pulled out the knife during a confrontation with defendant and threatened to use it against him; (4) slammed defendant against a closet door, pulled defendant's shirt up over defendant's head, and placed the knife against defendant's throat; (5) punched defendant in the face while holding the knife in his hand; and (6) told defendant he was going to kill him. The State also presented an edited audio and video recording of a police interview involving defendant taken several hours after the stabbing. During the interview, defendant (1) admitted to stabbing Howard after Howard threw an object, possibly a liquor bottle, at him and ran towards him; (2) asserted he was not part of a gang despite being friends with members of a gang; (3) gave several explanations as to what he did with the knife after the stabbing; and (4) stated, "I ain't supposed to do it like that, I wasn't supposed to stab him to be for real cause he didn't, he didn't have nothing for me to be scared no more. I know I could whip his a*** you know what I'm saying and I was just in the heat of the moment because he had the knife and now I got the knife ***."

¶ 11 The defense presented testimony from two witnesses who were at the party. Through that testimony, the jury was provided with information suggesting (1) Howard was intoxicated, armed with a knife, and confrontational with defendant and others during the party; (2) Howard placed defendant up against a wall and told him he was going to take his life while holding the knife; and (3) Howard's friends told Howard to kill defendant while he was up against the wall.

¶ 12 On the final day of trial, Davis informed the trial court the defense would rest without calling defendant to testify. The court then admonished defendant as follows:

"THE COURT: Okay. And Mr. Gunn, I need to admonish you personally, okay? The statements in this case were that you were going to testify, and you have an absolute Constitutional right to testify or to not testify, but it needs to be your election. Do you understand this?

- 3 -

MR. GUNN: Yes, sir.

THE COURT: Have you had an opportunity to discuss with Ms. Davis and Ms. Locke whether or not you wish to testify?

MR. GUNN: Uh-huh.

THE COURT: And they have advised you in that respect I take it?

MR. GUNN: Yes, sir.

THE COURT: And do you feel well-informed about this decision that you have made?

MR. GUNN: Yes, sir. I do.

THE COURT: It is my understanding that you do not wish to testify at this time, is that correct?

MR. GUNN: I do not."

¶ 13    At the jury instruction conference, the trial court ruled, over the State's objection, it would instruct the jury on self-defense and second degree murder based on imperfect self-defense.

¶ 14    In closing, the defense did not dispute defendant stabbed Howard with a knife. Instead, the defense argued defendant did so as a matter of self-defense or, alternatively, imperfect self-defense. Conversely, the State argued defendant had neither a reasonable nor unreasonable belief he needed to use force to protect himself. In so arguing, the State published to the jury portions of the audio and video recording of the police interview involving defendant and highlighted, in part, defendant's statement indicating he knew he had nothing to fear because he had the knife. The State also commented defendant "lied" to the police during the interview when he provided varying accounts to where he discarded the knife. In response to this comment, the defense argued the fact defendant "lied" did not "tell us about what happened at the party" and suggested it was simply an act done by an 18-year-old who felt "guilty" because he "stabbed somebody."

¶ 15    The trial court instructed the jury on self-defense and second degree murder based on imperfect self-defense. The court also instructed the jury: (1) "Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded" and (2) "The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict."

¶ 16    Following deliberations, the jury found defendant guilty of first degree murder, and in March 2010, the trial court sentenced him to 35 years' imprisonment. Defendant's conviction and sentence were later affirmed on appeal. *People v. Gunn*, 2012 IL App (4th) 100397-U.

¶ 17                                D. Postconviction Proceedings

¶ 18    In February 2013, defendant filed a *pro se* postconviction petition, which later advanced to the second stage of postconviction proceedings. Appointed postconviction counsel supplemented defendant's *pro se* postconviction petition, and the State filed a motion to dismiss. Following a hearing, the trial court granted the State's motion to dismiss.

¶ 19    In December 2013, defendant appealed from the dismissal of his postconviction petition, and this court reversed and remanded for new second-stage proceedings, concluding defendant was denied reasonable assistance of postconviction counsel. *People v. Gunn*, 2015 IL App (4th) 131093-U.

- 4 -

¶ 20 In August 2016, defendant, through newly appointed postconviction counsel, filed an amended postconviction petition, which was later amended a second time. The amended postconviction petition alleged claims of ineffective assistance based upon trial counsel's (1) waiver of defendant's right to have the trial court inquire about the prospective jurors' understanding and acceptance that a defendant's failure to testify cannot be held against him and (2) unfulfilled promise to the jury in opening statement that it would hear from defendant. In a personal affidavit that was attached to the amended postconviction petition, defendant averred he would have testified but for Davis's decision to change course midtrial and advise him his testimony was not necessary. The State, thereafter, filed a motion to dismiss. Following a hearing, the trial court granted the State's motion to dismiss.

¶ 21 In September 2017, defendant appealed from the dismissal of his amended postconviction petition, and this court reversed and remanded for a third-stage evidentiary hearing, finding defendant's amended postconviction petition made a substantial showing of a constitutional violation. *People v. Gunn*, 2020 IL App (4th) 170653, ¶¶ 29-38, 146 N.E.3d 772. We specifically found, accepting the well-pleaded facts in defendant's amended postconviction petition and its accompanying documentation as true, an evidentiary hearing was warranted to allow Davis to be called as a witness to develop a record concerning why she decided to change course midtrial and advise defendant his testimony was not necessary. *Id.* ¶ 38.

¶ 22 In August 2020, the trial court, with the same judge who presided over the jury trial, held a third-stage evidentiary hearing on defendant's amended postconviction petition. The court heard testimony from Davis and defendant. The following is gleaned from the testimony presented.

¶ 23 Davis, who had since retired from the practice of law, testified about her training and experience. Davis was licensed to practice law in 1977. From about 1990 until her retirement in 2010, she served as a full-time public defender. During her career, Davis tried several murder cases, "[p]robably between 12 and 20."

¶ 24 Davis began representing defendant shortly after he was charged in this case. Davis met with defendant often, somewhere between 10 and 15 times. During those meetings, they discussed trial strategy, expected testimony, and defendant's statement to the police. They also reviewed a recording of defendant's police interview. At some point, Davis became aware of defendant's intellectual deficiencies, which resulted in her filing the pretrial motion to suppress.

¶ 25 Up until the close of the evidence on the second to last day of trial, both Davis and defendant planned on defendant testifying. Because of that, Davis waived defendant's right to have the trial court ask prospective jurors if they understood and accepted the principle that a defendant's failure to testify cannot be held against him and made statements during her opening statement indicating the jury would hear from defendant.

¶ 26 After the close of the evidence on the second to last day of trial, Davis conferred with other attorneys in her office as well as an investigator to review the evidence that had been presented against defendant and determine whether defendant should still testify. Davis formed the belief that defendant should not testify. Some of the attorneys in her office agreed with her, and some did not. Davis, recognizing the risk of defendant not testifying, stayed up most of the night debating the issue.

¶ 27 Ultimately, Davis decided to change course and advise defendant not to testify. She felt "very strongly" that was the right decision. Davis was examined about her reasoning for her

decision. Davis testified "the unforeseen circumstance was the strength of the case, which I did not anticipate going in." When asked to elaborate what she meant when she said the "strength of the case," Davis testified:

"The State's witnesses *** testified to facts that substantially supported our defense. I had not anticipated that because of the character of the witnesses, for want of a better term. They were not educated people. They were not experienced in testifying. They were not, I would say, schooled in what would be appropriate in the courtroom. And yet their testimony was extremely strong and honest, I believe, and supported our case."

Later, after confirming that she had read the police reports prior to trial and was familiar with what they said, Davis was asked how surprised she was concerning the evidence the State presented, to which she responded: "Well, as I said, very. Not so much as to what was said, but how it was presented, that the witnesses were very strong and couldn't—couldn't be deterred from what they said." Davis testified she also considered the risk of having defendant, an individual with intellectual deficiencies, subject to cross-examination by an experienced prosecutor. With respect to the risk associated with having defendant testify, Davis stated her decision to change course and advise defendant not to testify probably would not have occurred "[i]f that had been the only factor."

¶ 28     On the last day of trial, Davis met with defendant for about five to seven minutes, during which time she advised defendant not to testify. Davis explained to defendant that she believed the jury heard enough evidence to not convict him of first degree murder. Defendant testified he decided to follow Davis's advice, despite believing he did not have enough time to consider the decision and he needed "to get [his] story out." Defendant acknowledged he did not express any hesitation with his decision at the time it was made.

¶ 29     Defendant testified to what his testimony would have been had he testified at trial. Defendant described Howard's consumption of alcohol and marijuana as well as his erratic behavior, including his attempts to challenge various individuals at the party to physical altercations. Defendant explained how Howard had a knife strapped to his arm and, at one point, took the knife out and began waiving it around and "saying things like, he don't give a f*** about nothing. And he about to die. He's going to loose [sic] his life." Defendant also explained how Howard, at another point, threw the knife and almost hit a woman with it.

¶ 30     Defendant described an incident involving him and Howard. Defendant testified he intervened after Howard challenged his friend, Titus Brown, which resulted in Howard challenging defendant to a physical altercation. Defendant told Howard they could "have a conversation" in the hallway, and then both men went into the hallway. Defendant testified, "[Howard] grabbed me and pinned me up against the wall and put my shirt over my head." The incident ended when other individuals pulled Howard off defendant.

¶ 31     Defendant described a second incident involving him and Howard. Defendant testified he again intervened after Howard challenged Titus. Defendant explained he intervened by grabbing Howard's shoulder from behind, at which point Howard turned around and began striking him in the head with his left hand, while holding the knife in his right hand. Howard stated he was going to kill defendant and others were encouraging Howard to do so while using racial slurs. Howard held the knife up against defendant's throat. Eventually, defendant grabbed the knife by the blade, which caused him to sustain injuries to his hand, and was able to secure it from Howard. He then shoved Howard backwards and then ran towards the front door with the knife. Defendant heard a noise which sounded like a gunshot from behind him,

which caused him to turn around. At that point, defendant observed Howard "charging" towards him. Defendant testified he was fearful for his life and screamed at Howard to stop and then swung the knife, which caused Howard to stagger backwards. Howard continued towards defendant, and defendant yelled at him to stop again. At that point, defendant, believing his life was in danger and that he had no other option, stabbed Howard in the midsection and then fled. Defendant testified the altercation lasted "[n]o longer than two minutes" from the moment he pulled Howard away from Titus to the moment he fled. Defendant explained he fled because he was scared and believed his life was in danger.

¶ 32    Defendant testified about certain statements he made during the police interview that he wanted to testify about during trial. Defendant explained he wanted to tell the jury a statement he made indicating he was "stomped" by multiple people was a lie. Defendant also explained he wanted to tell the jury his statement that he kicked some snow over the knife after he threw it in the snow was a lie.

¶ 33    Defendant testified his statement during the police interview indicating he had nothing to be scared of because he had the knife was not truthful. He explained he did not tell the detectives he was afraid because he was having difficulties expressing how he felt during the interview. Defendant testified, contrary to the testimony of one of the witnesses at trial, he never challenged Howard to box.

¶ 34    Defendant acknowledged some of the testimony presented through the State's witnesses was favorable to the defense.

¶ 35    Davis, who heard defendant's testimony at the evidentiary hearing, acknowledged it was not markedly different than the statements he made during the police interview. Davis also agreed "a lot of the things that [she] would have had [defendant] testify to was brought out through the State's witnesses." Davis was examined about some of the references she made to defendant's expected testimony in her opening statement. Davis testified the lie she referenced referred to what defendant did with the knife after the incident. Davis did not believe that was a "substantial" lie that "figured into the jury's deliberations." Davis was also asked about how the trial testimony showed defendant was fearful even though he was the one with the knife, to which she explained:

> "Well, I don't think people said, I know he was afraid, if that's what your [*sic*] asking. But there were people who saw the actual actions of Shane Howard, and anybody in that position would have been afraid. Specifically[,] the people who testified who saw Shane Howard shove him up against the wall; people who saw him pull his shirt over his head; people who saw him hit him multiple times; people who saw him hold the knife to his throat and say I'm going to kill you. I think that's sufficient."

Davis acknowledged, in retrospect, it was a mistake to waive defendant's right to have the trial court inquire about the prospective jurors' understanding and acceptance that a defendant's failure to testify cannot be held against him and to promise the jury in opening statement that it would hear from defendant.

¶ 36    Following arguments, the trial court denied defendant's amended postconviction petition, concluding he failed to make a substantial showing of a constitutional violation. In so concluding, the court considered Davis's stated basis for changing course midtrial and advising defendant not to testify:

"So[,] what was the unforeseeable circumstances? And that was the way the State's case came out.

The way the State's case came out was such that I agreed over the objection of the State to give the requested instructions for second degree and self-defense. I think it's a master attorney that can establish their own case on the other side's case in evidence—on the case in chief. I think that's an excellent attorney."

The court specifically found Davis did not "anticipate the manner in which the State's witnesses would testify." The court also found Davis properly considered the risk of having defendant testify in reaching her decision to change course midtrial and advise defendant not to testify.

¶ 37    This appeal followed.

¶ 38    II. ANALYSIS

¶ 39    On appeal, defendant argues, contrary to the finding of the trial court, he made a substantial showing that his constitutional right to the effective assistance of counsel was violated, where Davis, after waiving his right to have the trial court inquire about the prospective jurors' understanding and acceptance that a defendant's failure to testify cannot be held against him and promising the jury in opening statement that it would hear from him, changed course midtrial and advised him not to testify even though there was no unforeseeable event which occurred at trial to justify the change in strategy. The State disagrees.

¶ 40    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2014)) provides criminal defendants with a collateral means to challenge their convictions or sentences based on violations of their rights under the federal or state constitutions. *People v. Cregan*, 2014 IL 113600, ¶ 18, 10 N.E.3d 1196. The burden to establish a constitutional violation ultimately belongs to the defendant alleging the violation. *People v. Pendleton*, 223 Ill. 2d 458, 473, 861 N.E.2d 999, 1008 (2006). Where, as here, a trial court finds a defendant failed to establish a constitutional violation after an evidentiary hearing that involved credibility determinations, we will reverse that finding only if it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23, 987 N.E.2d 371.

¶ 41    "The sixth amendment [(U.S. Const., amend. VI)] guarantees a criminal defendant the right to effective assistance of trial counsel at all critical stages of the criminal proceedings ***." *People v. Brown*, 2017 IL 121681, ¶ 25, 102 N.E.3d 205. Claims of ineffective assistance of counsel are governed by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246, 1255-56 (1984) (adopting *Strickland*). To succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687; *Brown*, 2017 IL 121681, ¶ 25.

¶ 42    To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel's performance was so "inadequate 'that counsel was not functioning as the "counsel" guaranteed by the sixth amendment.' " *People v. Dupree*, 2018 IL 122307, ¶ 44, 124 N.E.3d 908 (quoting *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999)). To satisfy the prejudice prong of *Strickland*, the defendant must demonstrate "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767 (quoting *Strickland*, 466 U.S. at 694). "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 43    In this case, the following undisputed facts are gleaned from the testimony presented at the evidentiary hearing. Both Davis and defendant anticipated defendant testifying up until the close of evidence on the second to last day of trial. Davis, therefore, waived defendant's right to have the trial court ask prospective jurors if they understood and accepted the principle that a defendant's failure to testify cannot be held against him and made statements during her opening statement indicating the jury would hear from defendant. Following the close of evidence on the second to last day of trial, Davis conferred with other attorneys in her office as well as an investigator to review the evidence that had been presented and determine whether defendant should still testify. Davis formed the belief that defendant should not testify. Some of the attorneys in her office agreed with her and some did not. Davis, recognizing the risk of defendant not testifying, stayed up most of the night debating the issue. Ultimately, Davis decided to change course and advise defendant not to testify. Defendant, relying on Davis's advice, elected not to testify.

¶ 44    Based upon these undisputed facts, we are presented with a situation where Davis, as a matter of trial strategy, changed course midtrial and advised defendant not to testify, which defendant relied upon when electing not to testify. Accordingly, the issue is whether Davis's trial strategy under the circumstances presented was so unsound or unreasonable that she cannot be considered functioning as the "counsel" guaranteed by the sixth amendment. As set forth in defendant's prior appeal, the resolution of this issue turns "on whether an unforeseeable event occurred at trial" to justify the midtrial change in strategy. *Gunn*, 2020 IL App (4th) 170653, ¶ 34.

¶ 45    At the evidentiary hearing, Davis, an experienced defense attorney, testified her decision to change course midtrial and advise defendant not to testify was based upon the fact she did not anticipate or foresee the State's case would be so weak and the defense's case so strong without defendant's testimony, along with the risk of having defendant, an individual with intellectual deficiencies, subject to cross-examination by an experienced prosecutor. Davis explained her evaluation of the State's case and the defense's case was based upon the favorable testimony from the State's witnesses that she did not anticipate. The trial court, with same judge who presided over defendant's jury trial, found Davis's testimony to be credible.

¶ 46    Defendant contends Davis's testimony that she did not anticipate or foresee the favorable testimony from the State's witnesses cannot "withstand examination." We disagree. Defendant asserts Davis's other testimony showed she was "aware of the anticipated content" of the testimony from the State's witnesses prior to trial. In support, defendant cites Davis's testimony indicating she had reviewed the police reports and was familiar with what the police reports said and her testimony indicating, in response to how surprised she was concerning the evidence the State presented, she was "[n]ot so much [surprised] as to what was said." Contrary to defendant's assertion, we find this testimony does not clearly show Davis was "aware of the anticipated content" of the testimony from the State's witnesses. Moreover, Davis explained she was "very" surprised by "how [the testimony] was presented, that the witnesses were very strong and couldn't—couldn't be deterred from what they said." The trial court, again with same judge who presided over defendant's jury trial, agreed with Davis's evaluation of the

testimony from the State's witnesses. Defendant does not dispute Davis's evaluation or suggest that evaluation, by itself, could not have been a reasonable or sound basis for her to change course midtrial and advise defendant not to testify.

¶ 47 Defendant also contends Davis could not have relied upon the risk associated with having him testify in reaching her decision as that risk was foreseeable prior to trial. We disagree. Davis did not testify the risk associated with having defendant testify, by itself, justified her decision to change course midtrial and advise defendant not to testify. Rather, Davis testified her decision was based upon the unanticipated or unforeseen favorable testimony from the State's witnesses, *along with* the risk of having defendant, an individual with intellectual deficiencies, subject to cross-examination by an experienced prosecutor. In fact, Davis stated her decision to change course and advise defendant not to testify probably would not have occurred if the risk associated with having defendant testify "had been the only factor." We find Davis, when faced with the unanticipated or unforeseen favorable testimony from the State's witnesses, properly reconsidered the risk associated with having defendant testify in reaching her decision.

¶ 48 Based upon the evidence presented at the evidentiary hearing, we find defendant did not establish Davis's decision to change course midtrial and advise him not to testify was so unsound or unreasonable that she could not be considered functioning as the "counsel" guaranteed by the sixth amendment. To the contrary, the record evinces Davis's decision was the result of an effective attorney gauging the evidence as it was presented throughout the trial. Defendant, therefore, failed to make a substantial showing that his constitutional right to the effective assistance of counsel was violated, and the trial court did not err by denying defendant's amended postconviction petition.

¶ 49                                      III. CONCLUSION

¶ 50 We affirm the trial court's judgment.

¶ 51 Affirmed.